UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

ELIZABETH W. MANN,

       Plaintiff,

v.                                      Action No. 2:20cv303

CITY OF VIRGINIA BEACH, et al.,

       Defendants.

UNITED STATE MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

On July 15, 2020, the defendants,[1] City of Virginia Beach ("City"), Gailyn Thomas ("Thomas"), and Wendy Swallow ("Swallow"), filed a motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), ECF No. 7, and a supporting memorandum of law, ECF No. 8. The motion was referred to the undersigned United States Magistrate Judge on August 10, 2020, pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b). ECF No. 15. For the reasons discussed below, the undersigned **RECOMMENDS** that the motion to dismiss be **GRANTED**.

## I.     PROCEDURAL HISTORY

On June 17, 2020, plaintiff Elizabeth W. Mann ("Mann"), filed a five-count complaint against defendants. Compl., ECF No. 1. In count one, Mann alleges that defendants, Swallow, Thomas, and the City, wrongfully terminated Mann's employment pursuant to Va. Code § 40.1-51.2(b). *Id.* ¶¶ 32–36. In count two, Mann alleges that the City maliciously instituted criminal

---

[1] On September 23, 2020, the Court granted plaintiff's motion to voluntarily dismiss the complaint against defendant David L. Hansen without prejudice. ECF No. 19.

proceedings against Mann. *Id.* ¶¶ 37–41. In count three, Mann alleges, in the alternative, that Swallow and Thomas maliciously instituted or assisted with the institution of criminal proceedings against Mann. *Id.* ¶¶ 42–46. In count four, Mann alleges that Swallow and Thomas violated her constitutional rights pursuant to 42 U.S.C. § 1983. *Id.* ¶¶ 47–51. Specifically, Mann alleges that her statements during a staff meeting in the wake of a workplace shooting, and in a subsequent email to City management and media, were protected under the Free Speech Clause of the First Amendment and that Swallow and Thomas retaliated against Mann for exercising her free speech right. *Id.* ¶ 49. In count five, Mann alleges that the City, acting pursuant to its official violence prevention policy, also violated her constitutional rights pursuant to 42 U.S.C. § 1983 by retaliating against her for exercising her free speech right. *Id.* ¶¶ 52–57.

On July 15, 2020, defendants filed a motion to dismiss all five counts of the complaint for failure to state claims, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, as well as a memorandum in support of the motion. ECF Nos. 7–8. On July 29, 2020, Mann filed an opposition to defendants' motion to dismiss. ECF No. 9. Defendants filed a reply to Mann's opposition on August 4, 2020. ECF No. 12. After review of the parties' submissions, the Court concludes that a hearing is unnecessary, and this matter is ready for decision. *See* E.D. Va. Local Civ. R. 7(J).

## II.    FACTUAL BACKGROUND[2]

From 2006 to June 14, 2019, Mann worked as a full-time employee for the City. Compl. ¶ 10. In 2019, Mann worked as a "Family Services Specialist," and was supervised by Thomas, Swallow, City Manager David Hansen ("the City Manager"), and Portia Green ("Green"). *Id.* ¶¶ 11–12.

Prior to May 31, 2019, Mann expressed several concerns to City employees. *Id.* ¶¶ 13–14. She expressed concerns regarding workplace safety, including violence prevention in the workplace, to Swallow, Thomas, Hansen, Green, Jennifer DeLawrence ("DeLawrence"), Elizabeth Boone ("Boone"), and other management level employees of the City. *Id.* ¶ 13. She also expressed concerns to the City Manager regarding workplace harassment and bullying by Swallow. *Id.* ¶ 14. Swallow knew of these complaints. *Id.*

On Friday, May 31, 2019, a gunman shot and killed or injured several City employees and coworkers of Mann at the Virginia Beach Municipal Complex. *Id.* ¶ 15.

The following Monday, June 3, 2019, Swallow and the City called a staff meeting ("the staff meeting") to discuss the shootings and the steps the City was taking in response. *Id.* ¶ 16. During the meeting, "Swallow advised Mann that she was allowed to express her feelings freely and honestly about the shootings," and Mann stated that she knew several of the employees who were victims and that "she believed that the shootings could have been prevented by [the City] and [its] management." *Id.* ¶¶ 17–18. Mann also stated "she did not believe that management, including Swallow, sincerely cared about their employees" and "that they had routinely abused,

---

[2] The facts detailed below are set forth in the complaint. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (observing that when addressing a Rule 12(b)(6) motion to dismiss, "a judge must accept as true all of the factual allegations contained in the complaint").

pushed, and bullied the employees in the workplace." *Id.* ¶ 19.  In response, Swallow became

angry, told Mann her statements were "condescending" and that Mann was not allowed to express

such opinions, and ordered Mann to leave the meeting. *Id.* ¶ 20.  Mann complied and left. *Id.*

On June 5, 2019, Mann sent an email ("the email") to the City Manager and several

members of the Virginia Beach City Council in which she "complained about workplace abuse,

bullying, and harassment of herself and other [City] employees" that resulted in "physical and

mental health ailments," as well as the City's "failure to address prior complaints of workplace

abuse, harassment and bullying." *Id.* ¶ 21.  In the email,[3] Mann identified eight individuals who

engaged in such behavior, writing:

> 1. Wendy Swallow, Interim Program Manager and one of my main harassers, did
> not make reports on approximately 10 neglect allegations and 3 sexual abuse
> allegations . . . .
>
> 2. Portia Green, my current supervisor who has joined the harassment crew and
> openly admitted she was mocking my disability, places clients at risk because she
> does not know policy very well but was hired to be a Human Services Supervisor I
> . . . .
>
> 3. Jennifer DeLawrence, who was my previous supervisor/harasser, was moved
> after I reported her spending more time selling LulaRoe on the clock than her city
> job, totally neglecting her unit and having 8 open cases where clients were
> discovered as deceased and at least 2 of those clients had passed away
> approximately two years prior. . . .
>
> 4. Elizabeth Boone, Housing Resource Administrator and another one of my main
> harassers, who was also one of the Social Services staff who was indicted for felony
> food stamp fraud after Hurricane Isabel but somehow got it nolle prosequi. . . .
>
> 5. Dannette Smith, previous DHS Director, who unnecessarily sent a client from
> Virginia Beach to ALABAMA via ambulance and violated all types of protocols

---

[3] The Court may properly consider the email attached to the complaint at exhibit A as part of the
pleading itself. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a
pleading is a part of the pleading for all purposes."); *see also Goines v. Valley Cmty. Servs. Bd.*,
822 F.3d 159, 166 (4th Cir. 2016) (providing that a court may "consider documents that are
explicitly incorporated into the complaint by reference and those attached to the complaint as
exhibits" (citations omitted)).

> and policies . . . . She was one of the worst bullies I had ever heard of, berating and
> humiliating workers, . . . and [she] scolded me in front of representatives from the
> various divisions in the department . . . .
>
> 6. Carol Summer, DHS Interim HR administrator, who tried to bully me and not
> allow me [to] record her, which I did anyway, and then humiliate[d] me . . . .
>
> 6. [sic] Gailyn Thomas, Deputy Director of Social Services, who demeaned me in
> a meeting in front of my peers after asking questions for clarification, was well
> aware of all of the harassment and allowed it to continue.
>
> 7. Although I am not under Deidra Bolden, Financial Administrator, I have heard
> horrific stories from numerous employees and have seen vicious emails and a text
> that workers have provided me.

ECF No. 1-1 at 1–2. In concluding the email, Mann also links the shooter's actions to the culture

of abuse at the City, noting "I personally believe the shooter was pushed until he snapped" and

that "[d]espite this tragedy, supervisors are still harassing and bullying people now." *Id.* at 3.

Mann also copied the email to several media outlets. Compl. ¶ 22. The City Manager forwarded

the email to Swallow, Green, DeLawrence, and Boone. *Id.* ¶ 23.

 Mann alleges that on June 6, 2019, Swallow, the City Manager, Thomas, or another City

employee, "called the police and falsely reported that Mann had threatened to harm Swallow

during the staff meeting and that Swallow was in fear for her safety." *Id.* ¶ 24. Police obtained an

arrest warrant for Mann and charged her with disturbing the peace, a Class 1 Misdemeanor carrying

a penalty of up to 12 months in jail and a fine of up to $2,500.00, and police served the warrant at

Mann's home. *Id.* ¶ 25.

 On June 14, 2019, the City, with the direct involvement of Swallow, Thomas, and the City

Manager, terminated Mann's employment. *Id.* ¶¶ 26, 28. The written letter indicates Mann was

terminated based on a "founded violation" of the City's violence prevention policy, which states

"any conduct that has the purpose of causing psychological harm and/or inducing fear will be

treated the same as conduct that has the purpose of causing physical harm." *Id.*; ECF No. 1-2 at

1. The termination letter[4] described the offending conduct as follows:

> On June 3, 2019 you made a comment to your supervisor at a staff meeting that, following an investigation, was found to be in violation of the City's Violence Prevention Policy. Specifically, at a meeting for staff to come together after the mass shooting that occurred in Building 2 at the municipal complex on May 31, 2019, you asked Ms. Swallow if you could speak freely. Ms. Swallow agreed and you began to express opinions about the lack of care shown by supervisors. Ms. Swallow attempted to stop the conversation, indicating that the group meeting was not the appropriate place for the discussion. You continued to speak making a comment to the effect of "you are the kind of supervisor that would cause someone to shoot people." Additionally, your tone was described as elevated and verbally aggressive, and creating a circumstance where staff felt fearful of what you might do. . . .

> . . . Furthermore, given that the statement(s) was made the first workday after the Friday, May 31 tragedy, the subject matter of the group meeting, and your online comments admitting that you made the alleged statements or similar statements in the meeting, it was determined that, in our opinion, there was sufficient evidence to substantiate the allegation of a violation of the City's Violence Prevention Policy.

> Furthermore, you have previously been counseled by your supervisors regarding professional communication in the workplace. Additionally, you received a 40-hour suspension on February 5, 2019 for failing to perform your assigned duties correctly, competently or at an adequate level of production. . . .

ECF No. 1-2 at 1–2. Mann maintains that the City falsely accused Mann of engaging in conduct

with the intent to cause psychological harm or to induce fear in its termination letter and that she

did not engage in any conduct for the purpose of causing such harm or fear. Compl. ¶¶ 26, 29.

## III.   DISCUSSION

**A.   Standards applicable to a motion to dismiss for failure to state a claim.**

A complaint must contain "a short and plain statement of the claim showing that the pleader

is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion to dismiss under Rule 12(b)(6) should be

---

[4] The Court may properly consider the termination letter attached to the complaint at exhibit B as part of the pleading itself. *See supra* note 3 and accompanying text.

granted if a complaint fails to allege "facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A Rule 12(b)(6) motion tests the legal sufficiency of a complaint and "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

Accordingly, when reviewing a motion to dismiss, a court must "assume all [well-pled facts] to be true" and "draw all reasonable inferences in favor of the plaintiff," but it need not "accept the legal conclusions drawn from the facts, and [] need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (citations and internal quotation marks omitted). Generally, a Rule 12(b)(6) motion to dismiss cannot reach the merits of an affirmative defense, but, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense . . . clearly appear on the face of the complaint," an affirmative defense, including a defense based on the statute of limitations, may be reached on a motion to dismiss. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).

The Court begins its review of Mann's complaint with the federal claims at counts four and five prior to turning to the state law claims at counts one, two, and three.

**B.     Count four against defendants Swallow and Thomas fails to state a claim under the First Amendment for a retaliatory discharge of a public employee.**

In count four, Mann alleges that Swallow and Thomas violated her constitutional rights pursuant to 42 U.S.C. § 1983. Compl. ¶¶ 47–51. Specifically, Mann alleges that her statements during a staff meeting in the wake of a workplace shooting, and in a subsequent email to City management and the media, were protected under the Free Speech Clause of the First Amendment and that Swallow and Thomas retaliated against Mann for exercising her free speech right. *Id.*

7

Defendants seek to dismiss the claim, advancing three principal arguments: (1) Mann's speech at the staff meeting constituted "true threats of violence" that lack protection under the First Amendment, (2) Mann failed to adequately state a claim for retaliation against a public employee under the First Amendment, and (3) that Swallow and Thomas possess qualified immunity in this matter. ECF No. 8 at 6–19. The Court addresses the three arguments in turn.

### (1)   Mann's statements did not constitute true threats of violence that lack protection under the First Amendment.

"[T]rue threats of violence constitute a category of speech falling outside the protections of the First Amendment." *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 729 (E.D. Va. 2015) (citing *Virginia v. Black*, 538 U.S. 343, 359 (2003)). A true threat is a statement "where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id.* As the Fourth Circuit noted in *United States v. White*, the true threats exception is justified by the need to "protect[] individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur." 670 F.3d 498, 507 (4th Cir. 2012) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)) (internal quotation marks omitted).

To determine whether a statement is a true threat, the Fourth Circuit uses an objective test—a "statement is a true threat 'if an ordinary reasonable recipient who is familiar with the context . . . would interpret [the statement] as a threat of injury.'" *George Mason Univ.*, 132 F. Supp. 3d at 729 (quoting *White*, 670 F.3d at 507). Because the standard of review is objective, "the context of the communication is essential to determine whether it is protected by the First Amendment." *In re White*, No. 2:07cv342, 2013 WL 5295652, at *44 (E.D. Va. Sept. 13, 2013) (citing *Watts v. United States*, 394 U.S. 705, 707–08 (1969)). Courts in the Fourth Circuit have "identified certain contextual factors relevant to the analysis of allegedly threatening remarks." *Id.*

8

These factors include the language itself, and "the context in which [the threat] was made, including not only the forum in which the statement was communicated, but also the reaction of the audience upon its utterance." *Id.* at *45. For instance, in *United States v. White*, the court found that the defendant made a true threat in an email when stating that he "would act if [the email recipient] did not respond quickly, concluding the email by comparing [the email recipient] to [a judge], whose relatives had been murdered." 670 F.3d at 512. The defendant also made a true threat when leaving "a message [at an office] that people who thought the way that [the message recipient] thought were hunted down and shot." *Id.* at 513.

The defendants and Mann differ starkly in their understanding of Mann's statements at the June 3rd staff meeting in the wake of the May 31, 2019, shootings at the Virginia Beach Municipal Complex. Defendants argue that Mann's speech at the staff meeting constituted "true threats of violence" not protected by the First Amendment. ECF No. 8 at 6. Specifically, defendants note that "[a] reasonable person familiar with the context of such outrageous statements in the wake of May 31, 2019 would interpret them as a threat of injury and these words 'by their very utterance' would inflict an injury on the person to whom it was directed." *Id.* at 7. Mann characterizes the statements differently. She argues that her speech at the staff meeting did not constitute "true threats of violence," but rather an "oral criticism of [the City's] failure to prevent workplace gun violence." ECF No. 9 at 4.

Viewed in the light most favorable to Mann, Mann's statements during the staff meeting may have been brash, but did not constitute threats like the two described above in *White*. After being "advised . . . that she was allowed to express her feelings freely and honestly about the shootings," Mann "stated that she knew several of the employees in Building 2 that were victims of the shootings including one person that was killed"; "that she believed that the shootings could

9

have been prevented by Virginia Beach and management"; "that she did not believe that management, including Swallow, sincerely cared about their employees"; and "that [management and Swallow] had routinely abused, pushed and bullied employees in the workplace." Compl. ¶¶ 17–19. Specifically referring to Swallow, Mann said something "to the effect of 'you are the kind of supervisor that would cause someone to shoot people.'"[5] ECF No. 1-2 at 1.

Although Mann's last statement came close to the line between protected speech and a true threat of physical violence, she did not cross it. In a vacuum, the statement "you are the kind of supervisor that would cause someone to shoot people" could be construed as an implicit threat of violence. *Id.* Indeed, a reasonable listener could interpet the term, "someone," as suggesting the speaker herself would act and the term, "people," as a reference to the listener as the intended victim. *Id.* The context of the statement, however, leads to a different conclusion. Indeed, the subject matter of the staff meeting called was to discuss tragic shootings in the City of Virginia Beach just a few days before, as well as the City's response. Compl. ¶ 16. This is distinct from the context of the email and the office message described in *White* where the discussion of murder and shootings was wholly unanticipated. 670 F.3d at 512–13. Instead, Mann raised the issue of

---

[5] Mann did not allege that she made this statement explicitly within the text of her complaint, but she attached a copy of the City's termination letter regarding her employment, which described this statement and may be properly considered by the Court. *See supra* note 3 and accompanying text. Although Mann did not expressly adopt the contents of the letter, nowhere did she allege that the termination letter's description of her statement as "making a comment to the effect of 'you are the kind of supervisor that would cause someone to shoot people'" was inaccurate. *See Davis v. Cole*, 999 F. Supp. 809, 812 (E.D. Va. 1998) (stating that "[n]owhere in the complaint does the plaintiff allege that the exhibits have been altered or that they misrepresent the events that transpired at the meetings," and accordingly considering the attached exhibits in examining a 12(b)(6) motion and "deferring to the exhibits where there is a conflict"). Mann disagreed with the termination letter's characterization of her statements as having "the purpose of causing psychological harm and/or inducing fear," but did not contradict the letter's description of the statements themselves. *See* Compl. ¶¶ 26–27. Therefore, the Court may properly consider the statements described in the termination letter in its review of defendants' motion to dismiss.

10

"shoot[ing] people" in a staff meeting called to discuss a shooting. ECF No. 1-2 at 1. In that specific context, Mann's statements, as alleged, were offered to provide her insights into why the tragic events unfolded—namely, that issues related to how management treats its staff are sufficiently grave to push someone to act out violently.

Defendants do not argue that Mann's June 5th email also constituted true threats of physical violence. *See* ECF No. 8 at 6–8. Therefore, having concluded that Mann's statements at the June 3rd staff meeting did not constitute true threats of physical violence, when viewed in the light most favorable to Mann, dismissal of this count at this early stage on this ground would be improper.

    **(2)    Mann fails to state a claim for retaliation under the First Amendment as a public employee.**

In general, the First Amendment protects "not only the affirmative right to speak, but also the 'right to be free from retaliation by a public official for the exercise of that right.'" *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000)). The right to be free from retaliation in the public employment context, however, presents unique limitations: "While government employees do not lose their constitutional rights at work, the Supreme Court has repeatedly held that the government may impose certain restraints on its employees' speech and take action against them that would be unconstitutional if applied to the general public." *Id.* (first citing *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004); then citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); and then citing *Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir. 2000)). This is because "[j]ust as an employee has a right to speak—even at work—public employers have the right to run efficient, functional operations." *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 351 (4th Cir. 2000). The court's "task . . . is to seek 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an

employer, in promoting the efficiency of the public services it performs through its employees.'" *Connick v. Myers*, 461 U.S. 138, 142 (1983) (quoting *Pickering*, 391 U.S. at 568).

Accordingly, the Fourth Circuit has identified four elements that "a public employee must establish [in order] to state a claim for deprivation of First Amendment rights flowing from an adverse employment action." *Goldstein*, 218 F.3d at 351. "First, to trigger First Amendment protection, the speech at issue must relate to matters of public interest," *Id.* at 351–52 (quoting *Hanton v. Gilbert*, 36 F.3d 4, 6 (4th Cir. 1994)), or "matter[s] of public concern." *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998). "Second, the 'employee's interest in First Amendment expression must outweigh the employer's interest in efficient operation of the workplace.'" *Goldstein*, 218 F.3d at 352 (quoting *Hanton*, 36 F.3d at 6–7). "Third, the employee must establish retaliation of some kind—that he was deprived of a valuable government benefit or adversely affected in a manner that, at the very least, would tend to chill his exercise of First Amendment rights." *Id.* (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 246 (4th Cir. 1999)). "Finally, the employee must establish a causal relationship between the protected expression and the retaliation: that the protected speech was a 'substantial factor' in the decision to take the allegedly retaliatory action." *Id.* (quoting *Edwards*, 178 F.3d at 248).

Defendants argue that Mann failed to adequately plead the first two prongs. ECF No. 8 at 8–14 (citing *McVey*, 157 F.3d at 277–78). Specifically, defendants state first that Mann was "airing individualized grievances as a public employee in a threatening manner, not speaking as a private citizen on a matter of public concern," and, second, that "[t]he City's interest in providing efficient services to its own employees as well as to the public in the wake of a mass shooting greatly outweighs Plaintiff's interests." *Id.* at 8, 13.

Mann argues that she adequately pled the two elements contested by the defendants. ECF No. 9 at 5. Specifically, she states that she "engaged in constitutionally protected First Amendment activity in that she, as a private citizen, verbally expressed her opinions on the policies and conduct of Virginia Beach with respect to workplace safety, gun violence, and violence prevention." Compl. ¶ 48. In addition, she argues that "[t]he City has not demonstrated that [her] comments actually disrupted the department of social services," and "even if there was some slight, temporary disruption that occurred . . . , the public interest in the statement that the mass shooting could have been prevented should outweigh any such slight disruption." ECF No. 9 at 9.

### (a)   Mann failed to adequately plead the first prong, because her statements did not involve matters of public concern.

The Court begins with the first prong by assessing "whether, after accepting all of plaintiff's well-pleaded allegations in [her] complaint as true and drawing all reasonable factual inferences from those facts in [her] favor, plaintiff was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest." *Lilienthal v. City of Suffolk*, 275 F. Supp. 2d 684, 690 (E.D. Va. 2003) (citing *Arvinger v. Mayor and City Council*, 862 F.2d 75, 77 (4th Cir. 1988)). "If the court determines that plaintiff was speaking as an employee about a matter of personal interest, rather than as a citizen on a matter of public concern, no First Amendment violation exists and the analysis stops." *Id.* (citing *Arvinger*, 862 F.2d at 77).

Whether a public employee's speech addresses a matter of public interest or concern "is a question of law to be decided by the court," *Arvinger*, 862 F.2d at 77, after reviewing "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48. Although the Fourth Circuit has "declined to 'articulate any sort of bright-line rule'" to govern this analysis, there are clear guideposts. *Vollette v. Watson*, No. 2:12cv231, 2012 WL 3026360, at *8 (E.D. Va. July 24, 2012) (quoting *Campbell v. Galloway*, 483 F.3d 258, 269 (4th

13

Cir. 2007)). Specifically, an employee's "[s]peech involves a matter of public concern if it affects the social, political, or general well-being of a community." *Lilienthal*, 275 F. Supp. 2d at 691 (citing *Connick*, 461 U.S. at 146). This is distinct from whether the subject matter is "interesting," which is of little import. *Vollette*, 2012 WL 3026360, at *7; *see DiMeglio v. Haines*, 45 F.3d 790, 805 (4th Cir. 1995) ("[T]he mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment."). Further, "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment, but are matters more immediately concerned with the self-interest of the speaker as employee." *Stroman v. Colleton Cnty. Sch. Dist.*, 981 F.2d 152, 156 (4th Cir. 1992) (citing *Connick*, 461 U.S. at 147). In addition, the forum where plaintiff's speech was made "will be relevant to the determination whether [it] relates to a matter of public concern.*" Borough of Duryea v. Guarnieri*, 564 U.S. 379, 398 (2011). Although the issue of "[w]hether the speech occurs inside or outside of the workplace is . . . not determinative," "internal non-public complaints are less likely to garner constitutional protection than publicly disseminated statements." *Vollette*, 2012 WL 3026360, at *7 (citing *Guarnieri*, 564 U.S. at 398).

Courts have consistently held that speech involving "[m]atters relating to public safety are quintessential matters of 'public concern.'" *Goldstein*, 218 F.3d at 353. When courts have made such a finding, the speech often identifies a concrete, *specific* issue that *directly* relates to public safety. *See, e.g., id.* (finding that allegations of twelve specific safety violations, insufficient training, and insufficient supplies at a fire department implicated matters of public concern); *Edwards*, 178 F.3d at 247 (finding that "the proper method of safely carrying a concealed handgun" was "a categorically public issue" implicating "the often hotly debated issues

surrounding the right of ordinary citizens to carry a concealed handgun"); *Cromer v. Brown*, 88

F.3d 1315, 1325–26 (4th Cir. 1996) (finding that a letter from multiple law enforcement officers

discussing racial discrimination involved matters of public concern, because the letter implicated

"the inability of the sheriff's office to carry out its vital public mission effectively"); *Lee v. Nicholl*,

197 F.3d 1291, 1295 (10th Cir. 1999) (finding that a memo regarding snow removal and traffic

safety at an intersection were subjects of public concern).   In addition, courts are careful to

distinguish between public safety concerns and internal employment disputes. *See Goldstein*, 218

F.3d at 353 ("While the content of Goldstein's speech incorporated matters that were clearly of

public concern—including allegations that safety regulations were being violated, the relevant

communications also incorporated matters that are not of public concern, including matters of

internal policy, favoritism, and other employment-related matters."); *Supinger v. Virginia*, 259 F.

Supp. 3d 419, 444 (W.D. Va. 2017) (finding that "the 'safety' concerns in which Plaintiff attempts

to cloak his personal issues with Dawson . . . only relate to the happenings within his own

workplace environment, which does not concern the general public," and that his "speech . . .

essentially amounts to complaints that his superiors were not adequately dealing with the

disruptive behavior of a coworker").

   With these considerations in place, the Court turns to the statements that Mann relies upon

for her retaliation claim—including both those made during the June 3rd staff meeting, which was

closed to the public, and Mann's June 5th email, which was sent to City management and media

outlets.[6]

---

[6] The Court understands Mann's complaint to state that she believes she faced retaliation for her
statements made during both the June 3rd staff meeting and in the June 5th email. Compl. ¶ 49
("Swallow, Thomas and Hansen . . . terminated Mann's employment in direct retaliation for Mann
exercising her clearly established right to express her opinions on issues of vital public concern,

(i)     **Mann's statements at the June 3rd staff meeting did not involve matters of public concern.**

As described in her complaint, Mann "stated that she knew several of the employees in Building 2 that were victims of the shootings including one person that was killed," "that she believed that the shootings could have been prevented by Virginia Beach and management," "that she did not believe that management, including Swallow, sincerely cared about their employees," and "that [management and Swallow] had routinely abused, pushed and bullied employees in the workplace." Compl. ¶¶ 17–19. Specifically referring to Swallow, Mann said something "to the effect of 'you are the kind of supervisor that would cause someone to shoot people.'" ECF No. 1-2 at 1.

Viewed in the light most favorable to her, Mann's statements at the staff meeting, as described in her complaint, do not involve matters of public concern. First, Mann's statements involve generalized complaints about the conditions of employment at the City and internal working relationships between supervisors and staff. At bottom, the concrete complaints she raised were concerns that City management did not "care[] about their employees" and that "they had routinely abused, pushed and bullied the employees in the workplace." Compl. ¶ 19. The Fourth Circuit has repeatedly made it clear that speech discussing internal workplace relationships and personal grievances do not constitute matters of public concern. *See, e.g., Brooks v. Arthur,* 685 F.3d 367, 371–72 (4th Cir. 2012) ("[M]any ordinary disputes in the public workplace should be settled or resolved without calling the heavy artillery of the Constitution into play. . . . [W]e have been wary of affording the broad cover of the First Amendment to comments limited to 'grievances about conditions of employment that cannot be considered matters of public concern.'"

---

workplace safety and gun violence *(during the staff meeting and in the email)* thereby depriving Mann of those First Amendment rights in direct violation of 42 U.S.C. § 1983." (emphasis added)).

(citing *Campbell*, 483 F.3d at 267)); *Stroman*, 981 F.2d at 156 ("Personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment.").

Although Mann characterizes these statements later in the complaint as "opinions on the policies and conduct of Virginia Beach with respect to workplace safety, gun violence, and violence prevention," Compl. ¶ 48, her own description of the statements in her complaint is incongruent with these conclusory statements, and the Court "need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Nemet Chevrolet, Ltd*, 591 F.3d at 253. For instance, Mann does not mention specific safety violations, inadequate safety procedures, or insufficient safety training that might directly link her statements to safety of the public, like those statements that constituted matters of public concern in *Goldstein*. 218 F.3d at 353. Instead, the present case is similar to *Supinger*, where the court found that "the 'safety' concerns in which Plaintiff attempts to cloak his personal issues with [his coworker] . . . only relate to the happenings within his own workplace environment, which does not concern the general public." 259 F. Supp. 3d at 444. Here, the essence of Mann's statements at the June 3rd staff meeting only related to her workplace environment and interrelationships between management and staff, unrelated to the social, political, or general well-being of the broader community.

In addition, the form and context of the statements support a finding that they do not involve a matter of public concern. Mann offered the statements at a staff-only meeting to discuss recent shootings in the workplace where the intended audience was not the public, but rather management and co-workers, underlining the nature of the statements as pertaining to internal disputes. As noted earlier, the fact that the statements were made internally in this way is not dispositive, but weighs against a finding of constitutional protection. *Vollette*, 2012 WL 3026360,

at *7 ("[I]nternal non-public complaints are less likely to garner constitutional protection than publicly disseminated statements." (citing *Guarnieri*, 564 U.S. at 398)).  Considering these factors and the content of Mann's statements together, the Court finds that Mann's speech did not involve a matter of public concern.

Because Mann's speech at the June 3rd staff meeting does not involve a matter of public concern, it is not protected by the First Amendment for purposes of a retaliation claim against a public employee.

      **(ii)**    **Mann's statements in the June 5th email did not involve matters of public concern.**

On June 5, 2019, Mann sent an email to Hansen, several members of the Virginia Beach City Council, and three news outlets in which she complained about workplace abuse, bullying, and harassment of herself and other City employees that resulted in physical and mental health ailments, as well as the City's failure to address previous complaints of workplace abuse, harassment, and bullying. ECF No. 1-1. As indicated in the earlier excerpts, Mann specifically identified eight individuals who had engaged in such behavior and describes examples of bullying that she has observed. *Id.* In concluding the email, Mann also links the shooter's actions to the culture of employee abuse at the City, noting "I personally believe the shooter was pushed until he snapped" and that "[d]espite this tragedy, supervisors are still harassing and bullying people now." *Id.* at 3.

Here, unlike Mann's comments at the June 3rd staff meeting, the form and context of Mann's June 5th email was directed to both City management and the public and are therefore more likely to result in a finding that it constituted a matter of public concern than statements made internally. *See Vollette*, 2012 WL 3026360, at *7.  The content of Mann's email, however, is an

even more stark example of the airing of internal workplace disputes than her comments at the staff meeting.

Again, despite Mann's assertions in the complaint that her email concerned "workplace safety and gun violence," the text itself is comprised of a list of individualized grievances against City employees, largely Mann's former and current supervisors. In the first example, Mann notes that "Wendy Swallow" was "one of [her] main harassers" who Mann had reported for failing to make requisite reports for her adult foster care clients, but who had been promoted anyway. ECF No. 1-1 at 1. In the second, Mann notes that Portia Green was her current supervisor who openly mocked her and who was hired to be a human services supervisor despite not knowing the policy very well. *Id.* In the third, Mann describes Jennifer Lawrence, who was a previous supervisor and harasser that Mann had reported for neglecting her unit and was later promoted. *Id.* The fourth describes another harasser, Elizabeth Boone, "who was indicted for felony food stamp fraud . . . but somehow got it nolle prosequi" and still worked as an administrator. *Id.* at 1–2. The fifth, Dannette Smith, "was one of the worst bullies . . . , berating and humiliating workers" and who "scolded [Mann] in front of representatives from the various divisions in the department." *Id.* at 2. The sixth, Carol Summer, "tried to bully . . . and humiliate" Mann. *Id.* The seventh, Gailyn Thomas, "demeaned [Mann] in a meeting in front of [her] peers after asking questions for clarification." *Id.* Lastly, Mann noted that "[a]lthough [she was] not under Deidra Bolden, Financial Administrator, [she had] heard horrific stories from numerous employees and . . . seen vicious emails and a text that workers have provided [to her]." *Id.* It is clear from the list that Mann "undoubtedly—and perhaps justifiably—felt slighted by some of the alleged conduct, [but] a purely personal grievance is not a matter of public concern." *Brooks*, 685 F.3d at 372.

The lone reference to workplace safety and gun violence in Mann's email was that she "personally believes the shooter was pushed until he snapped." ECF No. 1-1 at 3. Read within the context of the whole email, however, Mann's speculation on the shooter's motivations serves predominantly as a vehicle for Mann to list her personal grievances against the City that pertain to wholly internal conditions of the workplace and have nothing to do with the public.

Conscious of the fact that "[t]he Supreme Court has warned us to guard against 'attempt[s] to constitutionalize the employee grievance,'" the Court also finds that Mann's statements in her June 5th email do not involve matters of public concern. *Brooks*, 685 F.3d at 373 (citing *Connick*, 461 U.S. at 154).

> **(b)   The Court need not analyze the second prong of Mann's retaliation claim balancing the employee's interest vs. the employer's interest.**

As noted above, it is unnecessary for the Court to examine this contested element, because the Court has found that Mann's speech did not involve matters of public concern. *See Lilienthal*, 275 F. Supp. 2d at 690 ("If the court determines that plaintiff was speaking as an employee about a matter of personal interest, rather than as a citizen on a matter of public concern, no First Amendment violation exists and the analysis stops." (citing *Arvinger*, 862 F.2d at 77)).

Therefore, with regard to the defendants' motion to dismiss count four for failure to state a retaliation claim under the First Amendment, the Court finds that Mann's speech as alleged during the June 3rd staff meeting and in her June 5th email do not involve matters of public concern. Accordingly, Mann has failed to plead the first prong necessary to establish a retaliation claim, and the Court **RECOMMENDS** that defendants' motion to dismiss count four be **GRANTED**.

(3)    **The Court need not analyze Swallow and Thomas's qualified immunity defenses.**

Because the Court has found that Mann failed to adequately plead a retaliation claim under the First Amendment, the Court need not examine Swallow and Thomas's qualified immunity defenses as separate grounds for dismissal of count four.

C.    **Count five against defendant City of Virginia Beach fails to state a claim under the First Amendment for a retaliatory discharge of a public employee.**

In count five, Mann alleges that the City violated her constitutional rights pursuant to 42 U.S.C. § 1983. Compl. ¶¶ 52–57. Specifically, Mann alleges that her statements made during a staff meeting and in an email in the wake of a workplace shooting were protected under the Free Speech Clause of the First Amendment and that the City retaliated against Mann by terminating Mann pursuant to the City's violence prevention policy for exercising her free speech right. *Id.*

Defendants seek to dismiss the claim, advancing two principal arguments: (1) Mann has failed to adequately state a claim for retaliation against a public employee under the First Amendment, and (2) Mann has failed to state a plausible claim against the City for failure to adequately identify an official policy or custom through which the City deprived her of her constitutional right. ECF No. 8 at 19–21.

For the same reasons noted in part III(B)(2)(a) of this report and recommendation, the Court finds that Mann has failed to state a retaliation claim under the First Amendment, because her speech as alleged did not involve matters of public concern.  Accordingly, the Court **RECOMMENDS** that defendants' motion to dismiss count five be **GRANTED**.

Because the Court has found that Mann failed to adequately plead a retaliation claim under the First Amendment, the Court need not examine defendants' argument that Mann failed to

adequately identify an official policy or custom through which the City deprived her of her constitutional right as a separate ground for dismissal of count five.

**D.    Mann's state-law claims in counts one, two, and three against defendants for wrongful termination and malicious prosecution should be dismissed without prejudice.**

At the time of the filing of Mann's complaint, this Court had original, federal question jurisdiction over Mann's claims under 42 U.S.C. § 1983 and the First Amendment (counts four and five) as "civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (2018).  This Court also had supplemental jurisdiction over plaintiff's state-law claims for wrongful termination (count one) and malicious prosecution (counts two and three), because the claims were "so related" to the federal question claims "that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a) (2018).  Indeed, all five counts involved allegations that the defendants improperly retaliated against Mann for statements she made in a staff meeting and email, by terminating her employment with the City and reporting Mann to police for criminal proceedings.  Compl. ¶¶ 32–57.  Notably, "[t]his supplemental jurisdiction [is] not lost when the federal-law claims [are] dismissed." *Johansson v. Prince George's Cnty. Pub. Schs.*, No. CBD-13-2171, 2014 WL 7014430, at *2 (D. Md. Dec. 10, 2014).  Instead, "this Court 'may' decline to exercise supplemental jurisdiction now that it 'has dismissed all claims over which it has original jurisdiction,' but it is not required to do so." *Id.* (citing 28 U.S.C. § 1367(c)); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is *purely discretionary*." (emphasis added)).  Because this case was originally brought in federal court, the Court does not have the option of remanding the remaining claims to state court, leaving it only two options:  hear the claims or dismiss the claims.  *See* 14C Charles Alan Wright et al., Federal Practice and Procedure

§ 3739 (Rev. 4th ed. 2020) ("[F]ederal courts cannot remand an action that was originally filed in federal court." (citing *Wittner v. Banner Health*, 720 F.3d 770 (10th Cir. 2013))).

Dismissal of the claims without prejudice is appropriate in this case. As the Supreme Court has observed, "district courts [should] deal with cases involving pendent claims in the manner that best serves the principles of economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172–73 (1997). Here, "[i]t is early in the pre-trial period, therefore, the court is less concerned with fairness and judicial economy." *Village Builders on the Bay, Inc., v. Cowling*, 321 F. Supp. 3d 624, 630 (E.D. Va. 2018). In addition, "[t]he parties and the court have yet to expend significant resources on this case," mitigating any inconvenience caused by dismissal of the state-law claims without prejudice to refile in state court. *Id.* With respect to comity, "Virginia courts are better positioned to evaluate causes of action based upon Virginia law. . . . [as] 'the primary responsibility for developing and applying state law rests with state courts.'" *Id.* (citing *Dunlevy v. Coughlin*, No. 2:15cv347, 2016 WL 595300, at *4 (E.D. Va. Feb. 16, 2016)).

Accordingly, the Court **RECOMMENDS** that defendant's motion to dismiss counts one, two, and three be **GRANTED** without prejudice to proceeding in state court.

## IV.    RECOMMENDATION

For the foregoing reasons, the Court **RECOMMENDS** that defendants' motion to dismiss, ECF No. 7, be **GRANTED** as follows:

(1)    Defendants' motion to dismiss counts one, two, and three, asserting state law claims of wrongful termination and malicious prosecution, should be **GRANTED** without prejudice pursuant to the Court's discretion under 28 U.S.C. § 1367(c); and

(2)     Defendants' motion to dismiss the section 1983 claims in counts four and five against Swallow, Hansen, and the City of Virginia Beach for failure to state a retaliation claim under the First Amendment should be **GRANTED**.[7]

## V.     REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.     Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.     A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court

---

[7] The Court declines to consider Mann's request for leave to amend her complaint should the Court grant the defendants' motion to dismiss. ECF No. 9 at 14. In general, "[t]he court should freely give leave [to amend] when justice so requires. Fed. R. Civ. P. 15(a). In order "to determine whether 'justice so requires,'" however, "the court must have before it the substance of the proposed amendment." *Roskman Baking Co., Inc. v. Lanham Machinery Co., Inc.*, 288 F.3d 895, 906 (6th Cir. 2002). Because Mann has not yet provided the Court with her proposed amendment(s), deciding her request at this stage would be premature. In order for the Court to consider such a request, Mann must file a motion seeking leave to amend the complaint with the proposed amendments attached.

based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*,

737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

_____

Robert J. Krask
United States Magistrate Judge

Norfolk, Virginia
September 30, 2020